UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOMMY SCHUETTE,                                   Case No. 18-10497

            Plaintiff,                    Stephanie Dawkins Davis
v.                                                United States District Judge

STEVEN P. RAND, in his individual and
official capacity, and JACKSON COUNTY,

            Defendants.
_____/

**OPINION AND ORDER ON DEFENDANT STEVEN P. RAND'S
MOTION TO DISMISS AND ALTERNATIVELY FOR SUMMARY
JUDGMENT (ECF No. 33), DEFENDANT JACKSON
COUNTY'S MOTION FOR SUMMARY JUDGMENT (ECF No. 35), AND
<u>TOMMY SCHUETTE'S MOTION IN LIMINE (ECF NO. 48)</u>**

## I.   PROCEDURAL HISTORY

On February 12, 2018, Plaintiff Tommy Schuette ("Schuette") filed this

lawsuit, alleging that Steven P. Rand, the Sheriff of Jackson County ("Rand"), and

Jackson County ("County") discriminated against him based on his disability.  (*See*

*generally* ECF No. 1).  Schuette filed an Amended Complaint on July 3, 2018

alleging that (a) Rand and the County subjected him to a hostile work environment

on the basis of his disabilities (hearing loss and post-traumatic stress disorder),[1] in

_____

[1] Although Schuette alleges that he was subjected to a "sexually hostile work
environment" (*see, e.g.*, ECF No. 14, PageID.105), Schuette brought his hostile work
environment claims under disability rights statutes (the ADA and the PWDCRA).  (*See generally*

violation of the Americans with Disabilities Act ("ADA") (Count V) and the

Persons with Disabilities Civil Rights Act ("PWDCRA") (Count III); and (b) the

County retaliated against him by terminating his employment after he reported

Rand's conduct, in violation of 42 U.S.C. § 1981 (Count I), Title VII of the Civil

Rights Act of 1964 ("Title VII") (Count IV), and the Elliot-Larson Civil Rights

Act ("ELCRA") (Count II). (*See generally* ECF No. 14).

On June 21, 2019, Rand filed a Motion to Dismiss and Alternatively for

Summary Judgment. (ECF No. 33). In his motion, Rand argues that Schuette's

official capacity claims cannot stand against him because they are duplicative of

those already pleaded against the County. (*Id.* at PageID.328–29). He also asserts

that Schuette does not demonstrate a genuine dispute of material fact as to his

ADA and PWDCRA claims against Rand in his individual capacity because

neither statute authorizes individual liability and Schuette failed to show that he

suffered from a hostile work environment based on his disability. (*Id.* at

PageID.329–42).[2]

---

*id.*) Moreover, in his Amended Complaint, Schuette classifies these hostile work environment claims as ones based on his disability. (*Id.* at PageID.104–07). For these reasons, the undersigned finds that Schuette alleges that he suffered a hostile work environment based on his disability, not sex.

[2] Rand also argues that Schuette's ADA claim must fail because he did not obtain a right-to-sue letter from the EEOC for this claim. (ECF No. 33, PageID.340–41). The court lacks sufficient information to assess Rand's argument. And, even if that were not the case, because the court dismisses all claims against Rand in his official and individual capacities for the reasons explained below, the court need not address this argument.

The County also filed a Motion for Summary Judgment. (ECF No. 35). In it, the County argues that: (1) it had no authority to affect or control the terms, conditions, or privileges of Schuette's employment, (*Id.* at PageID.722–24, 730–33);[3] (2) Schuette failed to request a reasonable accommodation, (*Id.* at PageID.719–20, 734); (3) Schuette is not "disabled" under the PWCDRA, (*Id.* at PageID.718–19), and he is not a "qualified individual with a disability" under the ADA, (*Id.* at PageID.733–34); (4) Schuette was not subjected to a hostile work environment, (*Id.* at PageID.727–29); (5) Schuette's purported "protected activities"—reporting Rand's conduct and allegedly committing extortion—were not protected activities, (*Id.* at PageID.720–22, 735–36); and (6) Schuette did not suffer a materially adverse action because the County had a constitutional right to file a criminal complaint, (*Id.* at PageID.729–30).

Schuette timely filed his Responses, and Rand and the County timely filed their Replies.[4] For the reasons set forth below, the court **GRANTS** Rand's Motion to Dismiss and **DISMISSES** Schuette's claims against Rand and **GRANTS IN PART AND DENIES IN PART** the County's Motion for Summary Judgment.

---

[3] With respect to his ADA claim, the County also argues that Schuette failed to identify the County policies that have violated his rights. (ECF No. 35, PageID.731–33).

[4] The County filed two versions of its Reply: the first of which, (ECF No. 44), had neither a table of contents nor an index of authorities; the second of which, (ECF No. 45), was corrected to contain these items. In this opinion, the court has elected to cite to the corrected version of the County's Reply.

The court also **GRANTS IN PART AND DENIES IN PART** Schuette's Motion in Limine.

## II.    FACTUAL BACKGROUND

In 1998, Schuette began working as a sworn officer for the Jackson County Sheriff's Department ("Sheriff's Department"). (ECF No. 33-2, PageID.403). He was regarded as a productive member of the Sheriff's Department. (*Id.* at PageID.364). Schuette joined the Jackson County Special Response Team ("SRT") in 2004 and rose to become its Commander. (*Id.* at PageID.361). Schuette began indirectly reporting to Rand in 2013 when Rand promoted him to lieutenant. (*Id.* at PageID.364; ECF No. 33-3, PageID.466).

### A. <u>Schuette's Hearing Loss</u>

When he was attending the police academy, Schuette was first diagnosed with hearing loss. (ECF No. 33-2, PageID.361). His hearing worsened after he joined the SRT, due to the repeated use of "extremely loud" "flash bangs." (*Id.* at PageID.362). Rand was aware of Schuette's hearing loss since at least 2011 and perhaps as early as 2009. (*Id.* at PageID.370–71; ECF No. 33-3, PageID.473). Indeed, in 2010 or 2011, Schuette began to look for hearing aids with Rand's assistance. (ECF No. 33-2, PageID.370). In 2016, Schuette reported his hearing loss to Richard Martonchik, the Jackson County Human Resources Director. (*Id.* at PageID.416).

## B. **Rand's Harassment of Schuette**

Schuette testified that, as a result of his hearing loss, Rand frequently

referred to him as "deaf and dumb, "fucking retard," "deaf retard," "faggot," and

"pussy." (ECF No. 33-2, PageID.371, 374, 398). This harassment occurred

"daily." (*Id.* at PageID.363, 371, 375, 392, 449). Several witnesses corroborated

Schuette's allegations. For instance, Sgt. Jason Breining declared that he had seen

Rand "mock" Schuette "so frequently [that it] is hard to pinpoint specific dates."

(ECF No. 41-2, PageID.1077) (Breining's Declaration). Providing greater detail,

Breining stated:

> At staff meetings, Sheriff Rand would make fun of
> Tommy by saying things like 'what, you couldn't hear
> me?' He would also say to Tommy, 'what[,] are you
> deaf?' or 'Heeeeeeyyyy Tommy,' while impersonating a
> handicapped person. I witnessed several occasions
> where these verbal attacks were followed by Sheriff
> Rand further imitating a handicapped person by talking
> funny, holding his hand bent against his chest, and
> making odd facial expressions.

(*Id.*)[5] In a similar vein, Lt. Mike Coburn relayed that Rand would "make fun of

Tommy on many occasions" by saying things like "can you hear me Tommy?"

_____

[5] Detective Brad Reed, Deputy Josh Lewis, and Former Deputy and Union President Andrew Sullivan shared similar anecdotes, averring that Rand would frequently "mock" or otherwise comment on Schuette's hearing issues while "imitating a mentally handicapped person." (ECF No. 41-3, PageID.1082) (Reed's Declaration); (ECF No. 41-4, PageID.1086) (Lewis's Declaration); (ECF No. 41-7, PageID.1094) (Sullivan's Declaration). Jason Hamman, a former lieutenant, made similar allegations, (ECF No. 41-6, PageID.1091), as did Schuette during his deposition, (ECF No. 33-2, PageID.372).

while "moving his fingers like he was talking in sign language." (ECF No. 41-5, PageID.1088) (Coburn's Declaration). Similarly, Jason Hamman, a former lieutenant, declared that "when Tommy would talk, Sheriff Rand would pretend [that] he could not hear Tommy." (ECF No. 41-6, PageID.1091) (Hamman's Declaration). Schuette and various witnesses also noted a number of incidents where Rand made discriminatory comments about African Americans, women, and the overweight. (*See generally* ECF No. 41, PageID.1051–54).

Schuette admits that he made various "inappropriate comments" and "ignorant jokes" during staff meetings too. (ECF No. 33-2, PageID.375). He also exposed himself to Rand and other members of the Sheriff's Department, including at a golf outing. (*Id.* at PageID.369, 372). Most relevant here, Schuette acknowledged that he "ma[de] fun of the sheriff" and of an individual who frequented the Sheriff's Office whom members of the Sheriff's Department, including Schuette, considered "deaf and dumb," though not to the individual's face. (*Id.*) He also conceded that he used the words "retard," "window lickers," and "purple tongues," to refer to handicapped individuals, including in conversations with Rand, and that he made jokes about himself pertaining to his ability to hear, saying that he was "deaf" and "asking people to speak up." (*Id.* at PageID.371–72). He claims that he did these things due to "the culture of that place and to survive the culture." (*Id.* at PageID.394).

6

### C.  Schuette Steps Down as SRT Commander

In 2016, Schuette began speaking with Rand "about his hearing concerns and stepping down as SRT Commander." (ECF No. 33-2, PageID.417, 426). Because of Schuette's problems effectively communicating with his team during a dispatch and his "concern[s] for [his] mental safety," Schuette "broke down crying" in Rand's office, testifying that he knew it was "time for [him] to get out" of the SRT unit. (*Id.* at PageID.357–58, 417).  Rand responded by telling him to "stop being a pussy" and threatening to demote him. (*Id.* at PageID.359).[6] Schuette subsequently reported his hearing loss to Martonchik, who arranged for him to have hearing tests. (*Id.* at PageID.416).  The hearing test revealed sensorineural hearing loss in 2016. (ECF No. 41, PageID.1057).

To address Schuette's concerns about his hearing loss and the results of his hearing tests, Rand met with Martonchik, and David Best, an attorney for the County, to discuss options for Schuette's employment moving forward. (ECF No. 33-3, PageID.476).  Martonchik and Best laid out three options for dealing with the situation. (*Id.*)  Rand could discharge Schuette; reduce Schuette's salary by 25% and keep him performing administrative tasks; or keep him at his current salary but prohibit him from wearing a uniform. (*Id.*)  Rand opted for the lattermost option:

---

[6] Rand denies taking issue with Schuette's request to leave the SRT unit. (ECF No. 33-3, PageID.475–76).

allowing Schuette to step down from the SRT unit and serve as a road patrol lieutenant. (*Id.*) Although this move was not a demotion and Schuette retained the same pay and benefits despite a decrease in job duties and responsibilities, he was no longer permitted to don a uniform, carry an exposed firearm, or wear a badge. (*Id.*; ECF No. 33-2, PageID.423). Losing his uniform had a "mental impact" on him because "[he] spent . . . [his] whole career . . . as a police officer, a very proud police officer . . . ." (ECF No. 33-2, PageID.376).

### D. Rand's Harassment of Schuette Intensifies

According to Schuette, Rand's harassment intensified after he reported his hearing loss to Martonchik. (ECF No. 33-2, PageID.374). Rand referred to Schuette as "deaf retard" on "pretty much" a daily basis. (*Id.* at PageID.375). On October 19, 2017, Schuette left work, indicating that he needed some time off for personal reasons. (ECF No. 33-11, PageID.562; ECF No. 33-10, PageID.551). He sought and received short-term disability benefits, which were approved on December 11, 2017. (ECF No. 33-9, PageID.530). On November 13, 2017, the County's short-term disability administrator, Rebecca Ruley, emailed Martonchik, informing him that "I talked with Mr. Schuette and he said this is a psych claim. He is alleging harassment due to his hearing loss and the only person he named as belittling him is the sheriff." (ECF No. 40-10, PageID.953).

8

### E. January 17, 2018 Meeting

In an effort to create a record of Rand's alleged harassment, before he left on personal leave, Schuette had begun to secretly record the Sheriff's Office command meetings.[7]  (ECF No. 33-2, PageID.385, 397–99).  On January 17, 2018, Schuette met with Jackson County Administrator Michael Overton and Martonchik.  (ECF. No. 14, PageID.100).  During the meeting, Schuette played a number of these secret audio recordings to show that Rand had engaged in inappropriate conduct toward him and others.  (*Id.*)  He also provided witness information.  (*Id.*)  Schuette contends that Martonchik and Overton "were only minimally interested, and after only a few recordings," Martonchik stated 'Ok we're disgusted and have heard enough.'"  (*Id.* at PageID.101).

The County alleges that, during the meeting, Schuette demanded that Rand be removed from office and that Schuette receive three years' wages and three years credit for his pension.  (ECF No. 33-10, PageID.546, 552–53; ECF No. 33-4, PageID.511).  According to the County, Schuette threatened that, if his demands were not met, he would go public with his recordings.  (*Id.*)  Perhaps unsurprisingly, Schuette vehemently denies the County's version of events.  Instead, Schuette insists that he merely told Overton and Martonchik that he

---

[7] Schuette's recordings included degrading comments about others, but may not have included any of the derogatory comments about his hearing loss that Rand is alleged to have made.  (ECF No. 33-2, PageID.382, 398–99).

"deserved" to be placed "on paid leave pending an investigation [of Rand]."  He

contends that they "completely fabricate[d] the story about an enhanced pension

and three more years and if not I'm releasing the tapes."  (ECF No. 33-2,

PageID.391).

After the meeting, Overton and Martonchik reported Schuette's conduct as a

blackmail attempt to the Michigan State Police.  To the court's knowledge, this

investigation is still ongoing.  (*See generally* ECF No. 35-3).  Thereafter, the audio

recordings were made public via a series of articles published by MLive, the first

of which was released on February 14, 2018.  (ECF Nos. 35-4, 35-5, 35-6).  Four

days after the publication of the first article, the Jackson County Board of

Commissioners passed a Resolution, stating that, although it "does not possess

legal authority over the elected office of Sheriff . . . [it] officially condemns, in the

strongest way possible, the egregious conduct engaged in by the Sheriff and

unanimously calls upon Sheriff Steve Rand . . . to voluntarily resign . . . ."  (ECF

No. 35-7, PageID.789).  The Board of Commissioners also requested that the

Governor of Michigan remove Rand from office.  (*Id.*; ECF No. 35-8,

PageID.791).  Despite these requests, Rand remained in office.  For this reason, on

May 18, 2018, the Board of Commissioners passed a resolution in which they

eliminated all of Rand's fringe benefits.  (ECF No. 35-9, PageID.795).

## III.   ANALYSIS AND CONCLUSION

### A.   <u>Schuette's Claims Against Rand</u>

#### 1.   <u>Standard of Review for Motion to Dismiss</u>[8]

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must first

comply with Rule 8(a)(2), which requires "'a short and plain statement of the claim

showing that the pleader is entitled to relief,' in order to 'give the defendant fair

notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S.

41, 47 (1957)).  A plaintiff is also obliged "to provide the grounds of his

entitlement to relief," which "requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Ass'n of*

*Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007)

(quoting *Twombly*, 550 U.S. at 555 (citations and internal quotation marks

omitted)).

In *Iqbal*, the Supreme Court explained that a civil complaint only survives a

motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to

state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[8] The undersigned notes Rand's moving papers provide the standard of review for a motion for summary judgment but not that for a motion to dismiss.  However, Rand's motion was titled a "Motion to Dismiss and Alternatively for Summary Judgment."  (ECF No. 33, PageID.311).  Because the court finds that Schuette's claims against Rand should be dismissed, the court's analysis proceeds under Federal Rule of Civil Procedure 12(b)(6) only.

677 (2009).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Id.* at 678.  And, while a complaint need not

contain "detailed" factual allegations, its "[f]actual allegations must be enough to

raise a right to relief above the speculative level on the assumption that all the

allegations in the complaint are true."  *Id.* (quoting *Twombly*, 550 U.S. at 555

(citation and internal quotation marks omitted)); *see also League of United Latin*

*Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (reasoning that the

factual allegations in a complaint need not be detailed but they "must do more than

create speculation or suspicion of a legally cognizable cause of action; they must

show entitlement to relief").

### 2.   Official Capacity

Rand argues that Schuette cannot sustain any official capacity claims against

him because they are duplicative of those pleaded against the County.  (ECF No.

33, PageID.328).  Schuette does not respond to Rand's official capacity argument.

(*See* generally ECF No. 40).  Therefore, Rand argues that the court should deem

Schuette to have waived opposition to this argument.  (ECF No. 42, PageID.1234).

It is true that while Schuette filed a lengthy response in which he directly

opposes a number of Rand's arguments, he responds to Rand's challenge to his

official capacity claim with silence.  And while a court may, in the interest of

justice, consider the motion's merits, there does not appear to be any circumstance warranting such consideration here. *Alexander v. First Premier Bank*, No. 17-cv-13950, 2018 WL 513761, at *1–2 (E.D. Mich. Jan. 23, 2018) (considering the merits of a motion to dismiss that was unopposed by a *pro se* plaintiff); *see also Humphrey v. U.S. Att'y Gen.'s Office*, 279 F. App'x. 328, 331 (6th Cir. 2008) (quoting *Scott v. Tenn.*, 878 F.2d 382 (Table), at *2 (6th Cir. 1989)) ("[Where] a plaintiff fails to respond or to otherwise oppose a defendant's motion . . . the district court may deem the plaintiff to have waived opposition to the motion."). It is not for the court to fashion an argument out of whole cloth. Indeed, "[I]ssues adverted to in perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). Here, the issue is not adverted to but rather ignored and thus waived.[9] Accordingly, Counts III and V as applied to Rand in his official capacity are **DISMISSED**.

3.   Individual Capacity

Rand argues that Schuette's claims against him in his individual capacity should be dismissed because neither the ADA nor the PWDCRA authorizes

---

[9] Notwithstanding the court's conclusion concerning waiver here, the issue of the effect of official capacity suits is discussed later in this opinion *infra* pp. 44–45.

individual liability.  (ECF No. 33, PageID.329, 339–40).  Rand contends that the PWDCRA does not impose liability on defendants sued in their individual capacity, citing *Lee v. Mich. Parole Bd.*, 104 F. App'x. 490, 493 (6th Cir. 2004), *Farhat v. Mich. Dep't of Corrections*, No. 12-10864, 2012 WL 5874813, at *4 (E.D. Mich. Nov. 20, 2012), and *Down v. Ann Arbor Pub. Sch.*, No. 17-13456, 2018 WL 6649722 (E.D. Mich. Dec. 19, 2018).  (ECF No. 33, PageID.329).  Similarly, Rand argues that the Sixth Circuit has held that the ADA also does not permit public employees or supervisors to be sued in their individual capacities.  (ECF No. 33, PageID.340).

For his part, Schuette concedes that Rand cannot be held individually liable under the ADA, but he argues that the same is not true under the PWDCRA.  (ECF No. 40, PageID.850).  Relying on *Elezovik v. Ford Motor Co.*, 472 Mich. 408, 422 (2005), and *Mayes v. City of Oak Park*, No. 05-CV-74386-DT, 2007 WL 9751967, at *9 n.18 (E.D. Mich. Sept. 28, 2007), Schuette asserts that the Michigan Supreme Court has interpreted the term "employer" within the meaning of the ELCRA to create individual liability under that Act.  (ECF No. 40, PageID.850).  According to Schuette, the term "employer" as defined in both the ELCRA and the PWDCRA includes "the agent" of a person having one or more employees; in contrast, the term "employer" under the ADA has a different definition.  (*Id.*)  Schuette argues that the cases Rand cites for support do not address this distinction in statutory

14

language and thus ignore "the Michigan Supreme Court's admonition against 'the freewheeling transfer of the term from one statute to another.'" (*Id.* at PageID.851 (quoting *Wurtz v. Beecher Metro. Dist.*, 495 Mich. 242, 252 n.14 (2014)).

In reply, Rand first argues that this court should decline to exercise supplemental jurisdiction over Schuette's PWDCRA claim.[10] (ECF No. 42, PageID.1234–35). Turning to Schuette's assertion that the PWDCRA imposes individual liability, Rand relies on *Down*, 2018 WL 6649722, arguing that Schuette's position has already been rejected in this district. (*Id.* at PageID.1236). Rand points out that the court in *Down* specifically declined to find that the PWDCRA imposes individual liability because the ADA does not impose such liability. (*Id.*)

Absent authoritative precedent on the issue, the court agrees with the conclusion in *Down* that the PWDCRA does not impose individual liability. In *Down*, the plaintiff conceded that there is no individual liability under the ADA, just like Schuette has here. 2018 WL 6649722, at *4. Also, like Schuette, the plaintiff in *Down* argued that the PWDCRA imposes individual liability, and the *Down* plaintiff relied on the same case on which Schuette relies—*Elezovic*, 472

---

[10] Rand acknowledged that this issue was not raised in the original motion. (ECF No. 42, PageID.1235). However, he argues that "Plaintiff had not conceded at that time to the lack of individual-capacity claims under the ADA, thus forcing Defendant to address all claims on the merits." (*Id.*)

Mich. 408.[11]  Notwithstanding *Elezovic*, *Down* declined to impose individual

liability under the PWDCRA:

> Michigan courts have interpreted [the ELCRA]
> differently than its federal counterpart, Title VII, due in
> part to differences between the two statutes.  In contrast,
> Michigan courts have found the PWDCRA and ADA to
> be similar.  Because the ADA does not impose individual
> liability on supervisors, the Court finds that supervisors
> similarly may not be held personally liable under the
> PWDCRA.

*Down*, 2018 WL 6649722, at *4 (citations omitted); *see also Farhat*, 2012 WL

5874813, at *4 (holding that, because the Michigan Court of Appeals and the

Michigan Supreme Court have relied on the ADA in interpreting the PWDCRA

and because, in *Dillon–Barber v. Regents of Univ. of Michigan*, 51 F. App'x. 946,

948 (6th Cir. 2002), the Sixth Circuit held that superiors are not 'employers' under

the ADA, the ADA does not impose individual liability).

Schuette's argument that *Down* and *Farhat* do not address the definition of

"employer" under the PWDCRA does not require a different conclusion.  The

Michigan Court of Appeals and the Michigan Supreme Court look to the ADA in

interpreting the PWDCRA.  *See Chiles v. Mach. Shop, Inc.*, 606 N.W.2d 398, 405

(Mich. Ct. App. 1999) ("[The Michigan Court of Appeals] and the Michigan

Supreme Court have noted that the federal [ADA] and the PWDCRA share the

---

[11] *Elezovic* held that individual liability exists under the ELCRA.  *Id.* at 861.

same purpose and use similar definitions and analyses, and both courts have relied

on the ADA in interpreting the PWDCRA.").  The ADA does not impose

individual liability.  *See Williams v. McLemore*, 247 F. App'x 1, 8 (6th Cir. 2007);

*see also Hiler v. Brown*, 177 F.3d 542, 546 (6th Cir. 1999) (no individual liability

under the Rehabilitation Act of 1973); *Wathen v. General Electric Co.*, 115 F.3d

400, 404–05 (6th Cir. 1997) (no individual liability under Title VII of the Civil

Rights Act of 1964).  Schuette concedes as much.  (ECF No. 40, PageID.850).

Accordingly, the court finds that individual liability is not available under the

PWDCRA.

Consequently, Schuette has failed to state a claim against Rand in his

individual capacity, and Counts III and V as applied to Rand in his individual

capacity are **DISMISSED**.

**B.    Schuette's Claims Against the County**

1.    Standard of Review for Motion for Summary Judgment

When a party files a motion for summary judgment, it must be granted "if

the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party

asserting that a fact cannot be or is genuinely disputed must support the assertion

by: (A) citing to particular parts of materials in the record . . .; or (B) showing that

the materials cited do not establish the absence or presence of a genuine dispute, or

that an adverse party cannot produce admissible evidence to support the fact." Fed.

R. Civ. P. 56(c)(1).  The standard for determining whether summary judgment is

appropriate is "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th

Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52

(1986)).  Additionally, the evidence and all reasonable inferences must be

construed in the light most favorable to the non-moving party.  *Matsushita Elec.*

*Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact,

the burden of demonstrating the existence of such an issue shifts to the non-moving

party to come forward with "specific facts showing that there is a genuine issue for

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  That is, the party

opposing a motion for summary judgment must make an affirmative showing with

proper evidence and must "designate specific facts in affidavits, depositions, or

other factual material showing 'evidence on which the jury could reasonably find

for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (E.D. Mich. 2004).

However, mere allegations or denials in the non-movant's pleadings will not

satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving

party.  *Anderson*, 477 U.S. at 248, 251.

In assessing whether there is a genuine dispute about a material fact, the court must determine if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Such a determination requires that the court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254.  Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment, the court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252–53.  Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323.  The court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

    2.   <u>Hostile Work Environment</u>

Schuette alleges that the County subjected him to a hostile work environment based on his disabilities (hearing loss and post-traumatic stress disorder) in violation of the ADA (Count V) and the PWDCRA (Count III).

Under the ADA, employers are prohibited from:

> discriminat[ing] against a qualified individual on the
> basis of disability in regard to job application procedures,
> the hiring, advancement, or discharge of employees,
> employee compensation, job training, and other terms,
> conditions, and privileges of employment.

42 U.S.C. § 12112(a).

Under the PWDCRA, employers are prohibited from:

> Discharg[ing] or otherwise discriminat[ing] against an
> individual with respect to compensation or the terms,
> conditions, or privileges of employment, because of a
> disability or genetic information that is unrelated to the
> individual's ability to perform the duties of a particular job or
> position.

Mich. Comp. Laws § 37.1202(b).

"The PWDCRA substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012). When neither party provides a reason to treat the ADA and PWDCRA claims differently, courts typically apply ADA jurisprudence. *See*, *e.g.*, *id.* ("[Plaintiff] provides no argument as to why we should treat the claims separately, nor does our review indicate as much."). Here, neither party has suggested that the claims should be analyzed separately, except as to the application of Mich. Const. 1963, art. VII, § 6, so this court will apply ADA jurisprudence to both claims as appropriate.

20

The Sixth Circuit has recognized hostile work environment claims based on workplace harassment because of disability. *See Keever v. Middletown*, 145 F.3d 809, 813 (6th Cir. 1998). The standard for an ADA hostile work environment claim tracks the standard used for sexual harassment claims under Title VII. *Coulson v. The Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 858 (6th Cir. 2002). Under the hostile work environment theory, in order to survive summary judgment, Schuette must establish that: (1) he is a member of a protected class; (2) he was subjected to harassment, either through words or actions, based on his disability; (3) the harassment had the effect of unreasonably interfering with his work performance and creating an objectively intimidating, hostile or offensive work environment; and (4) there exists some basis for liability on the part of the employer. *Grace v. Uscar*, 521 F.3d 655, 678 (6th Cir. 2008). Moreover, "[t]he harassment must meet both an objective and a subjective test, 'in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to a reasonable person and the actual victim.'" *Id.* (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).

Factors for the court to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance.'"  *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (emphasis omitted)).  In addition, "courts must determine whether the 'workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'"  *Id.* at 678–79 (quoting *Harris*, 510 U.S. at 21 (internal citations omitted)).  "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious)" do not create a hostile work environment.  *Johnson v. Donahoe*, 642 F. App'x 599, 612 (6th Cir. 2016).  Failure to establish a *prima facie* case is grounds to grant a defendant summary judgment.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).

a.    Member of a Protected Class (Disabled Persons)

Schuette has adduced sufficient evidence to show that he is a member of a protected class.  To be a member of a protected class under the ADA, a plaintiff must be a "qualified individual with a disability."  *See* 42 U.S.C. § 12112(a).  "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  Therefore, to qualify for protection under the ADA, Schuette first must show that he is disabled.  An individual is disabled if he has a record of or is regarded as having "a physical or

mental impairment that substantially limits one or more major life activities." 42

U.S.C. § 12102(1). Hearing is a major life activity. 42 U.S.C. § 12102(2). It is

undisputed that Schuette suffers from hearing loss to a degree that substantially

limits his major life activity of hearing. (ECF No. 33-2, PageID.370–71; ECF No.

33-3, PageID.473).

Next, Schuette must show, at minimum, a genuine dispute of material fact as

to whether he can perform the "essential functions of the job." The Sixth Circuit

has established that the determination of whether a job function is essential should

be based on "more than statements in a job description and should reflect the actual

functioning and circumstances of the particular enterprise involved." *Hall v. U.S.*

*Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir.1988). Factors to consider when

determining whether a job function is essential include:

> (1) the employer's judgment; (2) the written job
> description; (3) the amount of time spent performing the
> function; (4) the consequences of not requiring
> performance of the function; (5) the work experience of
> past incumbents of the position; and (6) the current work
> experience of incumbents in similar jobs.

*Keith v. Cnty. of Oakland*, 703 F.3d 918, 925–26 (6th Cir.2013).

Schuette has created a genuine factual dispute as to whether he can perform

the essential functions of his job—Lieutenant. Although the County argues that

Schuette was not disabled under federal or state law because he "conced[ed] that

he cannot perform the job of SRT Commander," (ECF No. 35, PageID.734, citing

ECF No. 14, PageID.96–97), SRT Commander is not the job in question in this case.  Indeed, Schuette does not dispute that he stepped down as SRT Commander. (*see*, *e.g.*, ECF No. 33-2, PageID.424).  And he does not attribute his leaving that position to a hostile work environment.  Hence, Schuette is correct that the job in question is Lieutenant, the last job he held.  (ECF No. 41, PageID.1063).

Schuette testified that, after he stepped down as SRT Commander and took on the role of lieutenant, he primarily performed administrative duties, which included writing grants, conducting internal investigations, and handling disciplinary issues.  (ECF No. 33-2, PageID.376–77).  He also testified that he was no longer permitted to carry out road patrol functions.  (*Id.* at PageID.377).  Rand acknowledged that, in general, a lieutenant's job is "a lot of paperwork . . . . The job is managing grants, videos, FOIAs . . . . [V]ery seldom is there an expectation that you're on the road handling a call or doing anything of that nature."  (ECF No. 41-15, PageID.1205).  Consistent with Rand's description, Schuette primarily performed these administrative duties.  The only difference between Schuette and other lieutenants appears to be that Schuette was not permitted to go on road patrol. But even as to that difference, Rand testified that other lieutenants go on road patrol "*very seldom[ly]*."  (ECF No. 41-15, PageID.1205) (emphasis added). Notably, the County has not challenged his qualifications to continue to serve as a lieutenant.  And even if it were to do so, whether his inability to go out on the road,

something lieutenants "very seldomly" do, renders him unqualified is, at minimum, a question of fact.  Schuette has offered sufficient evidence to demonstrate that he was able to perform the position of lieutenant with what appears to be a minor modification of responsibilities in light of the infrequency of road patrol for the lieutenant position.  Thus, a reasonable jury could find that Schuette qualifies as a disabled person who is protected under both Acts.[12]

### b.    Harassment Based on His Disability

Schuette has created a genuine dispute of material fact as to whether Rand's harassment was based on his disability.  As outlined above, many of Rand's comments and actions directly referenced Schuette's hearing loss, such as when he called Schuette names like "deaf and dumb" and "deaf retard;" feigned sign language; and purported to imitate a deaf person.  (No. 33-2, PageID.371, 372, 374).  Further, Schuette has put forth sufficient evidence to show that his hearing loss was the motivating factor for comments adverting to his intelligence.  For example, Sergeant Breining relayed that he had seen Rand "mock" Schuette

> by saying things like 'what, you couldn't hear me?'  He would also say to Tommy, 'what[,] are you deaf?' or 'Heeeeeeyyyy Tommy,' *while impersonating a*

---

[12] The County argues that Schuette's ADA and PWDCRA claims must fail because he did not request a reasonable accommodation. (ECF No. 35, PageID.719–20, 734).  In response, Schuette says that the failure to accommodate is not a legal theory in this case.  (ECF No. 41, PageID.1061).  Because Schuette directly disclaims reasonable accommodation as his legal theory and instead pursues remedies for hostile work environment and retaliation claims, the court declines to address the issue any further.

> *handicapped person.* I witnessed several occasions
> where these verbal attacks were followed by Sheriff
> Rand further *imitating a handicapped person* by talking
> funny, holding his hand bent against his chest, and
> making odd facial expressions.

(ECF No. 41-2, PageID.1077) (emphasis added). Other members of the Sheriff's

Department told similar accounts. Because Rand "imitated a handicapped person"

by making physical gestures more typically associated with an intellectual or

mental disability while mocking Schuette's hearing loss, Schuette has shown that

these comments, taken together, reasonably could be interpreted to have been

motivated by his disability.

On the other hand, Schuette has offered insufficient evidence to support his

claim that he was subjected to a hostile work environment based on his post-

traumatic stress disorder. On November 13, 2017, Rebecca Ruley emailed

Martonchik, informing him that "I talked with Mr. Schuette and he said this is a

psych claim. He is alleging harassment due to his hearing loss and the only person

he named as belittling him is the sheriff." (ECF No. 40-10, PageID.953). Ruley

sent this email about three weeks after Schuette went on FMLA leave. (ECF No.

14, PageID.100). Significantly, Schuette has not alleged that Rand harassed him

*after* he went on leave. And, Schuette has presented no evidence that Rand and/or

the County was even aware of his post-traumatic stress disorder before this

November 2017 email. For these reasons, the court cannot find that Rand's

26

comments were based on Schuette's post-traumatic stress disorder and Schuette's

hostile work environment claims are thus limited to his hearing loss only.

### c.   Objectively Hostile Environment

To rise to the level of unlawful harassment, conduct must be "severe or

pervasive." *Ault v. Oberlin Coll.*, 620 F. App'x 395, 402 (6th Cir. 2015).

"[T]hough the frequency of the conduct is a relevant factor, it is not dispositive."

*Id.*  Severity includes "'whether it is physically threatening or humiliating, or a

mere offensive utterance.'"  *Id.* at 400 (quoting *Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 23(1993)).  "Relief may be available where the conduct is severe *or*

pervasive; it need not be both."  *Id.*  Another factor for the court to consider in

reviewing the offending conduct is "'whether it unreasonably interferes with an

employee's work performance.'"  *Id.*   In determining whether conduct is severe or

pervasive, "it is well-established that the court must consider the totality of

circumstances." *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir.

1999).

The County's argument that Rand's remarks were "stray comments"

underplays the record.  (ECF No. 35, PageID.728).  A reasonable jury could find

that the frequency, nature, and cumulative effect of the comments created an

atmosphere of pervasive harassment.  Schuette testified that Rand commented on

his hearing loss "daily"; and others, such as Sergeant Breining, have said that

27

Rand's harassment occurred "so frequently [that it] is hard to pinpoint specific dates." (ECF No. 33-2, PageID.363, 371, 375, 392; ECF No. 41-2, PageID.1077). Such descriptions are consistent with Schuette's claim that Rand became more relentless after he reported his hearing problems to human resources in October of 2016. (ECF No. 14, PageID.98). The record demonstrates that Rand made the remarks directly to Schuette and frequently in the presence of others. The behavior continued and led to Schuette taking medical leave in October of 2017 because of the toll it was taking on him. Though witnesses did not specify start and end dates for Rand's behavior, viewing the record in the light most favorable to the non-moving party, their accounts largely line up with Schuette's to such a degree that one may infer that the witness accounts reference the same or a similar time period. This daily harassment over the course of about a year is sufficient to create a material factual dispute as to whether Rand's harassment was pervasive. *See Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998) (finding that plaintiff's allegation that she was subjected to "commonplace," "ongoing," and "continuing" harassment for her seven-year employment was sufficient to raise a genuine dispute of material fact as to whether she was subjected to a sexually hostile work environment). As noted, a plaintiff need only show that the complained of conduct was either pervasive or severe. Thus, Schuette's claim is sufficient to advance to a jury on this issue.

d.    Subjectively Hostile Environment

Though a close question, the court finds that there is a genuine dispute of

material fact as to whether Rand's conduct was subjectively hostile.  Where, in

contrast to here, a plaintiff "generated, approved, or at least tolerated [disability] or

[disability]-loaded insults about others that were *worse* than any he had endured

about himself," it is unlikely that the conduct at issue was subjectively hostile.

*Iceberg v. Whole Foods Mkt. Group, Inc.*, 914 F. Supp. 2d 870, 881 (E.D. Mich.

2012) (emphasis added) (citing *Beard v. Flying J., Inc.*, 266 F.3d 792, 798 (8th Cir.

2001) ("[E]vidence that [a plaintiff] engaged in behavior similar to what [he]

claimed was unwelcome or offensive is evidence that the behavior was not

unwelcome.").  As the County points out, Schuette admitted during his deposition

that he engaged in "inappropriate" and "ignorant" conduct.  More particularly, he

conceded that, as a member of the Sheriff's Department, he made various

"inappropriate comments" and "ignorant jokes" during staff meetings.  (ECF No.

33-2, PageID.375).  He also exposed himself to Rand and other members of the

Sheriff's Department, including at a golf outing—activity seemingly unrelated to

issues of disability.  (*Id.* at PageID.369, 372).  Most relevant here, Schuette

acknowledged that he "ma[de] fun of the sheriff" and an individual who frequented

the Sheriff's Office whom members of the Sheriff's Department, including

Schuette, considered "deaf and dumb."  (*Id.* at PageID.369, 372).  He also

conceded that he used the words "retard," "window lickers," and "purple tongues," to refer to handicapped individuals, including in conversations with Rand, and that he referred to himself as "deaf" and, in an effort to "fit in," made light of his own hearing loss, "asking people to speak up." (*Id.* at PageID.371–72). Notwithstanding, a question of fact remains as to whether Schuette's behavior was "worse than he had endured himself." *Iceberg*, 914 F. Supp. 2d at 818. Indeed, in contrast to Rand, Schuette testified that he mocked Rand on a "very limited" basis, did not make comments about disabled people in their presence, and never made fun of anyone during staff meetings. (ECF No. 33-2, PageID.369, 371–72, 375). Nor was there any indication that he engaged in this behavior as frequently as Rand. (*Id.* at PageID.371–72). Moreover, Rand, as the Sheriff, was in a position of authority over Schuette. Thus, a reasonable jury could find that Schuette did these things due to "the culture of [the Sheriff's Department] and to survive the culture" and that, as a result, his behavior does not undermine a finding that his workplace environment was subjectively hostile. (*Id.* at PageID.394). Furthermore, Schuette has presented evidence that Rand's comments so unreasonably interfered with his work performance that he had to take a medical leave and sought counseling. (ECF No. 40-10, PageID.953; ECF No. 14, PageID.99–100). This fact further suggests that Schuette, in fact, found Rand's harassment subjectively hostile. Accordingly, there exists a genuine dispute of

material fact as to whether Rand's comments and conduct were subjectively

hostile.

### e.  Basis for Employer Liability

The County maintains that it is not Schuette's employer and exercises

insufficient control over Rand to be held liable for his actions and that Schuette has

not shown there exists any policy or custom that resulted in a hostile work

environment.  The court finds that Schuette is an employee of the County.  And

although the parties' briefs somewhat miss the mark, the court finds the County

may be liable for Rand's actions because he operated as an agent of the County

under the ADA.[13]

*Employer-Employee Relationship*.

First, the County argues that it is not Schuette's employer.  (ECF No. 35,

PageID.722–24, 730–33).  The court disagrees.

To sue under the ADA, a plaintiff must demonstrate an employer-employee

relationship.[14]  *Johnson v. City of Saline*, 151 F.3d 564, 567–68 (6th Cir. 1998)

---

[13] Although the court also finds that Rand is an agent of the County under the PWDCRA, the County is ultimately not liable under the Michigan Constitution, as discussed later in this opinion, *infra* Section III.B.2.f.

[14] Schuette points out that under the PWDCRA—unlike the federal employment statutes—he does not have to prove an employer-employee relationship per se.  (ECF No. 41, PageID.1064).  Michigan state courts have noted that "liability under the [PWDCRA] is not dependent on the existence of an employer-employee relationship."  *Chiles v. Mach. Shop, Inc.*,

("The definition of a 'qualified individual with a disability' clearly foresees an employment relationship."); *Janette v. Am. Fidelity Grp., Ltd.*, 298 F. App'x 467, 471 (6th Cir. 2008) ("[I]t is clear that application of the ADA requires the existence of an employer-employee relationship . . . ."). Because "what constitutes an employer-employee relationship under the ADA is not evident from the statute," courts use the common-law principles of agency to determine whether that relationship exists. *Johnson*, 151 F.3d at 568 (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992)). In *Darden*, the Supreme Court provided a series of factors for courts to consider:

> [T]he hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation.

*Johnson*, 151 F.3d at 568 (quoting *Darden*, 503 U.S. at 323–24). That being said, "while it is appropriate to apply *Darden* to many other statutory contexts, there is

---

606 N.W.2d 398, 403 (Mich. Ct. App. 1999); *See also McClements v. Ford Motor Co.*, 473 Mich. 373, 386 (2005). Instead, liability depends "on the ability to affect adversely the terms and conditions of an individual's employment or potential employment . . . ." *Id.* Because the court finds that Schuette has an employer-employee relationship with the County for purposes of the ADA, the court does not need to analyze this separately. Nonetheless, Schuette has likely demonstrated that the County sufficiently controlled the terms and conditions of his employment.

no one catch-all set of standards." *Id.* "[A] court should examine all incidents of the alleged employee/employer relationship, with the relative weight given to the various factors in the common-law analysis depending on the nature of the statutory context." *Id.* Here, given the unique context, some of these factors are not as helpful as others; however, the factors provide a useful starting point.

The County emphasizes that it exercises little control over the Sheriff's Department and deputy sheriffs, like Schuette. The Sheriff, and not the County, has the power to appoint and remove deputies. Mich. Comp. Laws § 51.70 ("Each sheriff may appoint 1 or more deputy sheriffs at the sheriff's pleasure, and may revoke those appointments at any time."); *Locke v. Macomb Cnty.*, 187 N.W.2d 500, 501 (Mich. Ct. App. 1971) ("[N]owhere does one find statutory language existing in Michigan authorizing the county to appoint or remove deputy sheriffs."). Furthermore, "the sheriff of a given county is the only official with direct control over the duties, responsibilities, and methods of operation of deputy sheriffs." *Kroes v. Smith*, 540 F. Supp. 1295, 1298 (E.D. Mich. 1982).

Though the factors discussed above lend some weight to the County's argument, the balance of other factors tip the scales enough that a reasonable juror could find that the County exercises enough control over the Sheriff's Department and its work to consider it Schuette's employer for purposes of the ADA. To begin, the County's Harassment Policy expressly makes itself applicable to elected

33

county officials like the Sheriff. (ECF No. 41-10, PageID.1174). And the language of the Policy declares that the County's policy *must* be used in relation to any complaints about illegal harassment. (*Id.* at PageID.1176). The policy also prohibits any official accused under the policy from taking retaliatory actions against a complainant. (*Id.*) Thus, to affect a change in what he perceived to be a hostile work environment, Schuette was required to utilize the County's procedures. Moreover, the events in this case also demonstrate the active role that the County's Human Resource department plays in employment issues arising in the Sheriff's Office. Indeed, before taking any action regarding Schuette's employment status in light of his hearing loss, Rand consulted with the County regarding his options. (ECF No. 33, PageID.324). The County laid out three options; Rand chose the third, placing Schuette on administrative duties but with no pay reduction. (*Id.*) While Rand may not have been bound by the County's advice, its role in administering its HR policies apparently extended to sheriff's deputies also. For example, Schuette, also in consultation with HR, took a hearing test and ultimately received FMLA leave. (ECF No. 41, PageID.1057–58). And HR also held a meeting with Schuette in which he had the opportunity to complain about Rand's actions. There is also some evidence that the County is empowered to shift employees and units within the Sheriff's department. As Schuette points out, the County previously "removed the 911 Dispatch Center from the Sheriff's

Department, along with the lieutenant (Hamman) who is now a civilian employee." (*Id.* at PageID.1064). And the County appears to maintain some control over the number of deputy sheriffs. *See* Mich. Comp. Laws § 45.405 ("The sheriff shall appoint an under-sheriff and may, in his discretion, appoint such deputy sheriffs *as may be provided for by the board of supervisors*." (emphasis added)).

More indirectly, but still relevant, the County controls the pay of the deputy sheriffs and issues their W-2s. Mich. Comp. Laws § 45.401(1) ("The county board of commissioners of each county in this state may direct the payment to the sheriff, under-sheriff, and deputy sheriffs . . . out of the general fund in the treasury of the county, salaries as the board considers proper."). The County also appears to control the benefits of the Sheriff's Department, as demonstrated by the County's revocation of Rand's "health insurance, vehicle, retiree health care and other fringe benefits," (ECF No. 45, PageID.1268), and its role in administering Schuette's disability benefits.

Further, while there appear to be no cases in this circuit directly on point, several cases have assumed without discussion that a deputy sheriff can sue the County under employment discrimination statutes. *See, e.g.*, *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 617 (6th Cir. 2013) (deputy filed suit "for wrongful termination against both his *employer*, Washtenaw County, and his superior" under, among other statutes, Title VII, § 1981, and the ELCRA) (emphasis

added)); *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719 (6th Cir. 2000)

(ADA and Title VII); *Smith v. Osceola Cnty.*, No. 1:06-cv-89, 2008 WL 2036826

(W.D. Mich. May 9, 2008) (Title VII and the ELCRA).

Based on the totality of the circumstances, Schuette has presented sufficient

facts to create a genuine dispute as to whether the County was his employer. [15]

*Sheriff as Agent of the County*.

Because Schuette is an employee of the County, the next question is whether

the County is liable for Rand's actions. In other words, is the Sheriff an agent of

the County? Like Title VII, the ADA and PWDCRA define "employer" as

including any agent of an employer. 42 U.S.C. § 12111(5)(A) ("The term

'employer' means a person engaged in an industry affecting commerce who has 15

---

[15] If not the direct employer of Schuette, then the County is still likely his "joint employer." "Although a direct employment relationship provides the usual basis for liability under the ADEA or ADA, courts have fashioned various doctrines by which a defendant that does not directly employ a plaintiff may still be considered an 'employer' under those statutes." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997). Under one of those approaches, "courts consider whether one defendant has control over another company's employees sufficient to show that the two companies are acting as a 'joint employer' of those employees." *Id.* (citing *Carrier Corp. v. NLRB*, 768 F.2d 778 (6th Cir. 1985). "Entities are joint employers if they 'share or co-determine those matters governing essential terms and conditions of employment.'" *Nethery v. Quality Care Investors, L.P.*, 814 F. App'x 97, 103 (6th Cir. 2020). Courts should consider the "entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance." *Id.* Even if Rand was Schuette's direct employer, the County would likely still be a joint employer for many of the same reasons discussed in this section. *See Capitol City Lodge No. 141, Fraternal Order of Police v. Chater Twp. of Meridian*, 282 N.W.2d 383, 386 (Mich. Ct. App. 1979), *abrogated on other grounds by St. Clair Prosecutor v. Am. Fed'n of State, Cnty. and Mun. Employees, AFL-CIO*, 425 Mich. 204, 229 (1986).

or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and *any agent of such person*." (emphasis added)); Mich. Comp. Laws § 37.1201(b) ("'Employer' means a person who has 1 or more employees or a person who as contractor or subcontractor is furnishing material or performing work for the state or a governmental entity or agency of the state and *includes an agent of such a person*." (emphasis added)).

Like the term "employee," because the ADA does not define the term "agent," courts "look to the common law of agency" to determine whether an individual acted as the employer's agent. *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 996 n.7 (6th Cir. 1997); *See also Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72 (1986) (finding that Congress's decision to define "employer" under Title VII to include "any agent" evinced an intent for "courts to look to agency principles for guidance in this area"). "An agent is one who consents to act on behalf of another and subject to the other's control." *Swallows*, 128 F.3d at 996 (citing Restatement (Second) of Agency § 1 (1958)). "An agent within the context of the . . . employment discrimination statutes must be an agent with respect to employment practices." *Id.* "An employee is generally considered an agent of his or her employer." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162 (11th Cir. 1993) (citing Restatement (Second) of Agency § 2). "Agent" is "a term that embraces but is more encompassing than 'employee.'" *Shager v. Upjohn*

*Co.*, 913 F.2d 398, 404 (7th Cir. 1990).  In other words, "all employees are agents, but not all agents are employees."  *Id.*

As a preliminary matter, the County and Schuette both make arguments that miss the mark.  The County argues, citing § 1983 caselaw, that it cannot be held liable for Rand's actions because Schuette has failed to identify an official custom or policy that violated his rights.  (ECF No. 35, PageID.730–33) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).  Under § 1983, an individual can sue "[e]very person" who, under color of state law, violates his constitutional rights.  42 U.S.C § 1983.  The Supreme Court has interpreted the word "person" broadly to include municipalities.  *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (citing *Monell*, 436 U.S. at 690).  But the County has cited no authority applying the *Monell* construction of municipal liability outside of claims premised upon constitutional torts under 42 U.S.C. § 1983.  The court declines to adopt such a construction here.  Under § 1983, there is no *respondeat superior* liability.  *Id.*  In other words, a local government is not vicariously liable for the actions of its officers; instead, it is liable only if the plaintiff can identify an official policy or custom of violating constitutional rights.  That standard is inapplicable here, however, because in employment discrimination cases, such as this, a local government can be held liable for the actions of its agents.  *See, e.g.*, *Faragher*, 524 U.S. 775 (recognizing that employers can be

38

vicariously liable for the actions of their agents). Thus, this argument fails because Schuette does not have to show an official policy or custom.[16]

Schuette, on the other hand, contends that Rand is not just an agent of the County, but an actual proxy on its behalf. As a proxy, Schuette insists that Rand's actions are imputed to the County. (ECF No. 41, PageID.1064–65) (citing *Faragher*, 524 U.S. 775). Schuette's claim that, under *Faragher*, Rand is subject to proxy liability based on his position within the county is unpersuasive. In *Farahger*, the Supreme Court acknowledged that officials such as company presidents, business owners, proprietors and partners, and corporate officers act as proxies for their organizations. 524 U.S. at 789–90. And because their actions bind their organizations, their behavior in the employment context is also attributable to their organizations. *See id.* By analogy, Schuette argues that a sheriff is a proxy for the county. Yet, Schuette cites no authority suggesting such status attaches to a county sheriff. To be sure, Rand is statutorily authorized to

---

[16] Notably, § 1983 claims require a plaintiff to show that the violating party was acting under color of state law. This is not surprising considering the constitution specifically limits state action. Employment discrimination cases do not carry any such requirement, instead premising liability on concepts of agency. Section 1983 actions address underlying constitutional violations by or under the authority of the state, the former resulting in state or municipal liability and the latter resulting in individual liability. Thus, the mere fact that one of its agents engages in violative behavior is insufficient to create state liability. Rather, the municipality itself, by promulgating or establishing a law, policy or custom, must have taken some action or failed to train its employees in how to observe the constitutional rights of others. *See Monell*, 436 U.S. 658. Employment discrimination cases, however, have evolved under a different rubric; and while some employment claims may also implicate constitutional rights, plaintiffs are not required to frame them as constitutional torts.

oversee his department, including the authority to hire, fire, promote and demote personnel. *See*, *e.g.*, Mich. Comp. Laws § 51.70 ("Each sheriff may appoint 1 or more deputy sheriffs at the sheriff's pleasure, and may revoke those appointments at any time."). But Schuette offers no evidence that his power to bind the county extends beyond his department. Indeed, Schuette provides no discussion of the structure of the Jackson County government at all. Schuette simply has not made the case that the sheriff's authority renders him a proxy for the county.[17]

Nevertheless, Rand still may be an agent of the county. While the question of the sheriff's status as an agent may appear straight-forward at first blush, it is not. Like the County's argument as to whether Schuette was its employee, it insists that its lack of authority over the sheriff defeats any claim of agency. It points out that it is unable to command the sheriff to do anything. For example, "It has been recognized that a county board of commissioners may not directly interfere with the exercise of the authority conferred upon the sheriff." 1979-1980 Mich. Op. Atty. Gen. No. 5304. The County is also limited in its ability to change

---

[17] Although Schuette's argument fails to properly address the agency relationship between Rand and the County, the court does not find that necessarily fatal to his claim because the County also failed to properly analyze this issue. "[A] party moving for summary judgment *always* bears the burden of demonstrating the absence of a genuine issue as to a material fact." *Hanson v. Madison Cnty. Detention Ctr.*, 736 F. App'x 521, 535 (6th Cir. 2018) (quoting *Carver v. Bunch*, 946 F.2d 451, 454(6th Cir. 1991)). Where the movant fails to articulate a sufficient argument and fails to meet their burden, "an unsupported and poorly developed response to a motion for summary judgment is [] not necessarily fatal to the non-movant." *Id.*

the common law duties of sheriffs.  *See Brownstown Twp. v. Wayne Cnty.*, 242

N.W.2d 538, 539 (Mich. Ct. App. 1976) (citing *Allor v. Bd. of Auditors of Cnty. of

Wayne*, 43 Mich. 76, 102–03 (1880) ("The Legislature may vary the duties of a

constitutional office, but it may not change the duties so as to destroy the power to

perform the duties of the office.")  And, as the events in this case demonstrate, the

County cannot remove the sheriff without the intervention of the Governor or a

recall.  As to compensation, the County notes that although it sets the sheriff's pay,

it cannot decrease it during the sheriff's term of office.  (ECF No. 45,

PageID.1267).  The County further underscores that Rand refused to resign even

though it rescinded his various benefits.  (*Id.* at PageID.1268).

Although a close question, the court finds that these limitations on the

county's authority over the sheriff do not undermine a finding of an agency

relationship.  While Rand exercises autonomy greater than that of a deputy sheriff,

many of the same factors that led the court to conclude that Schuette is an

employee of the County lead the court to conclude that Rand is an agent of the

County.  As noted, the sheriff is also governed by the workplace policies

promulgated by the County.  Thus, while the county may not select or remove the

sheriff, it expressly subjects the sheriff as an elected official along with sheriff's

office employees to the requirements contained in its employment harassment

policy.  Indeed, that policy requires those in management and supervisory positions

41

to immediately report complaints of harassment and any harassment that they observe. (ECF No. 41-10, Page.ID 1175). The policy also provides that the County will "make accommodations that do not impose any undue hardship" where an employee requests accommodation based on a disability.[18] (*Id.*) The County also establishes the sheriff's budget and advises the sheriff on personnel matters, as evidenced by Martonchik's laying out three options for Rand to choose from in responding to Schuette's request to step down from the SRT Commander position. (*See* ECF No. 33-3, PageID.476). Furthermore, by the County's own admission, it retains the authority to grant or revoke the sheriff's employment benefits; in fact, it exercised that authority by revoking Rand's retiree health insurance, vehicle, and other fringe benefits after recordings were released containing his offensive and discriminatory comments. (ECF No. 35, PageID.736, ECF No. 44, PageID.1256). And the Sheriff is required "to perform all reasonable services within the jurisdiction of [his] offices for which the county may be liable." Mich. Comp. Laws § 45.407.

This conclusion finds additional support in the caselaw. The precedent on which Rand relies demonstrates that the sheriff's department is an agent of the county. *See Tucker v. Benzie City Sheriff's Department*, No. 1:16-cv-165, 2017

---

[18] Recognizing that Schuette does not proceed on a theory of failure to accommodate, the court notes the county's role pursuant to its policy to craft accommodations solely to analyze the extent to which it retains authority over the sheriff's actions in employment matters.

WL 8894640, at *7 (W.D. Mich. Jan. 30, 2017), *report and recommendation adopted*, 2017 WL 2390257 (W.D. Mich. June 2, 2017); *Bayer v. Macomb Cnty. Sheriff*, 185 N.W.2d 40, 41 (Mich. Ct. App. 1970).  These and similar cases reasoned as follows: "Michigan is a jurisdiction in which the sheriff and prosecutor are constitutional officers, and there does not exist a sheriff's department or a prosecutor's office. Instead, the sheriff and the prosecutor are individuals, elected in accordance with constitutional mandates." *Hughson v. Cnty. of Antrim*, 707 F. Supp. 304, 306 (W.D. Mich. 1988).  For this reason, "[t]he sheriff's department does not exist as a separate legal entity; it is simply an agent of the county." *Burnett v. Chippewa Cnty. Sheriff Dep't*, No. 2:06-cv-164, 2007 WL 2463226, at *3 (W.D. Mich. Aug. 28, 2007).  Although persuasive as to the department, the question still remains as to whether the sheriff himself or herself is an agent of the county.

Caselaw is sparse on this question.  While not directly on point, *St. Clair Prosecutor v. Am. Fed'n. of State, Cnty., and Mun. Emps., AFL-CIO, St. Clair Cnty. Gen. Emps. Chapter, Local No. 1518*, 425 Mich. 204, 228–230 (1986) is somewhat illuminative to the question of whether the sheriff is an agent of the county.  In *St. Clair*, the Michigan Supreme Court held that the county prosecutor is a co-employer with the county for purposes of the Public Employment Relations Act ("PERA").  *Id.* at 207.  In so holding, the Michigan Supreme Court criticized

the holding of *Capitol City Lodge No. 141, Fraternal Order of Police v. Meridian Twp.*, 282 N.W.2d 383 (Mich. Ct. App. 1979), which it construed as finding that the county sheriff was not an agent of the county for purposes of collective bargaining.[19] *See id.* at 228–30.

In other contexts, county sheriffs have been deemed to be agents of the county too. For instance, it is well-accepted in § 1983 cases, "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."[20] *Monell*, 436 U.S. at 690 n.55. Based on this statement, courts have frequently construed suits against sheriffs in their official capacities as suits against the counties—the assumption being that sheriffs are agents of the counties. *United Food & Commer. Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 751 (6th Cir. 2004) (construing Ohio law and holding that § 1983 claim against the sheriff of Shelby County, Ohio was a claim against Shelby

---

[19] *St. Clair* framed the issue in *Capitol City Lodge* as "whether the sheriff was an agent of the county." *Id.* at 229. The court notes, however, that a close reading of *Capitol City Lodge* demonstrates that the issue was whether the sheriff was an agent of a township. 282 N.W.2d at 387. The Michigan Court of Appeals held that the sheriff was not an agent of the township. *Id.* The case was silent on whether the sheriff was an agent of the county.

[20] While at first blush, it may seem inconsistent for the court to refer to § 1983 litigation for persuasive value while rejecting the County's application of the policy or custom standard, it is not. As the court has discussed, Schuette does not have to provide evidence of some county policy or custom that discriminates because the ADA and PWDCRA provide for a form of *respondeat superior* liability and § 1983 does not. Nevertheless, this distinction in liability framework does not affect the agency analysis, and § 1983 caselaw provides useful insight regarding the agency relationship between a sheriff and the county. As the cases discussed by the court note, courts often consider sheriffs and their deputies to be agents of their counties for purposes of § 1983.

County, Ohio); *Nallani v. Wayne Cty.*, 665 F. App'x. 498, 512 (6th Cir. 2016) (construing Michigan law and holding that § 1983 claim against the sheriff "in his or her official capacity is nothing more than a suit against the county itself"); *Lewis v. Laurel Cnty. Sheriff's Dep't*, No. 09-280-GFVT, 2011 WL 3475370, at *9 (E.D. Ky. Aug. 8, 2011) (reasoning that "claims against [the deputy sheriff] in his official capacity are truly claims against the Laurel County Sheriff's Department itself").

Taken together, the court finds that the record contains sufficient evidence to conclude that Rand was an agent of the County—at least as to law enforcement matters and employment matters within the Sheriff's Department. But that is not the end of the inquiry. The County's liability for Rand turns on his "status" as either the victim's co-worker or supervisor. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Id.* If the harasser, however, is a supervisor, then the employer may be strictly liable. *Id.* "If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Id.* "But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage

45

of the preventive or corrective opportunities that the employer provided." *Id.*
(citing *Faragher*, 524 U.S. at 807). The Supreme Court has clarified that a
"supervisor" is someone who "is empowered by the employer to take tangible
employment actions against the victim." *Id.*

Although brief, the County argues that *Faragher* liability "has no application
where the supervisory authority is not derived from the county." (ECF No. 45,
PageID.1267). According to the County, "[w]here the County does not appoint the
sheriff or control him in any lawful way, it cannot be vicariously liable for the
sheriff's wrongdoing." (*Id.*). Here, it is true, that the Constitution and state law
technically give sheriffs their powers, not the counties. Nonetheless, Rand acted as
a "supervisor" over the deputy sheriffs because of his ability to take tangible
employment actions against the deputies. The County does not dispute this.
Indeed, while arguing that it was not Schuette's employer, it emphasized that Rand
as sheriff had the sole authority to hire, fire, and punish deputy sheriffs.
Furthermore, even though the County did not directly decide that its sheriff would
be its agent, the court has already decided that Rand effectively was an agent of the
County. Rand, therefore, acted in all respects as the County's supervisor over the
Sheriff's Department and all its employees. As a result, the County is liable for
Rand's conduct, unless it raises and establishes the affirmative defense that it

exercised reasonable care and took prompt action and that Schuette failed to take advantage of available procedures. *Faragher*, 524 U.S. at 807.

There is evidence here to suggest that the County may have been able to make that requisite showing. But, it failed to raise this as an affirmative defense in its answer. "Federal Rule of Civil Procedure 8(c) requires defendants to raise affirmative defenses in their first responsive pleadings." *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d 656, 680 (6th Cir. 2018). "[T]he failure to do so may result in waiver of the defense." *Id.* (citing *Horton v. Potter*, 369 F.3d 906. 911 (6th Cir. 2004)). "[H]owever, as a practical matter, there are numerous exceptions to this broad rule . . . ." *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994). While a "failure to raise an affirmative defense by responsive pleading does not always result in waiver," the opposing party must still have "notice of the affirmative defense and a chance to rebut it." *Seals v. Gen. Motors Corp.*, 546 F.3d 766. 770 (6th Cir. 2008). For that reason, "[a] district court may, in its discretion, allow a defendant to raise an affirmative defense for the first time in a motion for summary judgment if doing so does not result in surprise or prejudice to the plaintiff." *Lauderdale v. Wells Fargo Home Mortg.*, 552 F. App'x 566, 573 (6th Cir. 2014). But here, while the County touches on some facts that are relevant to the affirmative defense in its reply brief, the County did not raise reasonable care in its moving papers, opting instead to argue against the applicability of

*Faragher* altogether.  Thus, the County neither fully argues the affirmative defense nor properly puts Schuette on notice of this defense.  Consequently, while Schuette's analysis rests upon his reading of *Faragher* and in some ways appears to anticipate the defense, it perhaps understandably does not directly respond to the unraised affirmative defense.  At this stage, therefore, the court will not address the merits of the defense.

In sum, the court finds that Schuette has created a genuine dispute as to whether he is an employee of the County, Rand is an agent of the County, and the County may be held liable for Rand's alleged harassment as a supervisor under the ADA.  For these reasons, the County's Motion for Summary Judgment as to Count V of Schuette's Complaint is **DENIED**.

### f.  Liability under the PWDCRA

But there is one last issue remaining as to Schuette's PWDCRA claim.  The County argues that it is immune from any liability stemming from Rand's actions under the PWDCRA according to Mich. Const. 1963, art. 7, § 6, which provides that "[t]he county shall never be responsible for [the sheriff's] acts, except that the board of supervisors may protect him against claims by prisoners for unintentional injuries received while in his custody."  This section of the Michigan Constitution "exempts a county from any vicarious liability arising from acts of the county sheriff."  *Graves v. Wayne Cnty.*, 333 N.W.2d 740, 743 (Mich. Ct. App. 1983); *See*

*also Lockaby v. Wayne Cnty.*, 406 Mich. 65, 77 (1979) (noting that a "county is constitutionally immune from responsibility for the sheriff's acts"). For example, counties are immune from ELCRA suits based on the actions of their sheriffs. *Greer v. Cnty. of Ingham*, No. 295672, 2011 WL 1005111, at *5 (Mich. Ct. App. Mar. 22, 2011) (recognizing that to hold the county liable under the ELCRA "would be in direct contravention of Const 1963, art 7, § 6"); *Moore v. Cnty. of Ingham*, No. 341905, 2019 WL 2866511, at *3 (Mich. Ct. App. July 2, 2019) (recognizing that "[e]ven if plaintiff were able to establish that her termination was discriminatory, Const 1963, art VII, § 6 precluded defendant's liability for the sheriff's actions in terminating plaintiff's employment").

The court finds that the County is immune from suit under Michigan's constitution because Schuette's claim of hostile work environment under the PWDCRA is wholly based on Rand's conduct. As a result, the County's Motion for Summary Judgment as to Count III of Schuette's Complaint is **GRANTED**.

3. <u>Retaliation</u>

Schuette raises three counts of retaliation against the County, one each, under § 1981 (Count I), the ELCRA (Count II), and Title VII (Count IV). Under § 1981, Schuette alleges that he was retaliated against for his opposition to racial discrimination. (ECF No. 41, PageID.1068). Under the ELCRA, he alleges that he was retaliated against for his opposition to unlawful weight-based harassment.

(*Id.*)  And under Title VII, Schuette alleges that he was retaliated against for his opposition to sexual discrimination against female deputies.  (*Id.*)

Retaliation claims can be established "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).  Because Schuette has proffered circumstantial evidence, he must first satisfy the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

"Under *McDonnell Douglas*, Plaintiff bears the initial burden to establish a *prima facie* case of retaliation."  *Laster*, 746 F.3d at 730.  "If Plaintiff succeeds in making out the elements of a *prima facie* case, 'the burden of production of evidence shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions.'"  *Id.* (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 538 (6th Cir. 2008)).  "'If the defendant satisfies its burden of production, the burden shifts back to Plaintiff to demonstrate that Defendants' proffered reason was not the true reason for the employment decision."  *Id.* "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process."  *Id.*

"On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of

the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d

651, 661 (6th Cir. 2000). "The court first determines if a plaintiff has put forth

sufficient evidence for a reasonable jury to find her to have met the prima facie

requirements . . . ." *Id.*

The elements for retaliation under § 1981, Title VII, and the ELCRA are the

same. *Kuhn v. Washtenaw County*, 709 F.3d 612, 627 (6th Cir. 2013) ("The

ELCRA analysis for retaliation claims is identical to the Title VII analysis.");

*Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) ("The elements of a

retaliation claim under § 1981 are the same as those under Title VII."). To

establish a *prima facie* case of retaliation, a plaintiff must establish that: (1) "he

engaged in an activity protected by [§ 1981, Title VII, and the ELCRA]"; (2) "his

exercise of such protected activity was known by the defendant"; (3) "thereafter,

the defendant took an action that was 'materially adverse' to the plaintiff"; and (4)

"a causal connection existed between the protected activity and the materially

adverse action." *Laster*, 746 F.3d at 730.

As to all three of Schuette's claims for retaliation,[21] the County argues that

Schuette has failed to show a genuine dispute as to two elements of its *prima facie*

---

[21] The County also inexplicably argued that Schuette failed to create a genuine dispute as
to retaliation under the PWDCRA. (ECF No. 35, PageID.720–22). But Schuette has not raised a
retaliation claim under the PWDCRA.

case:  protected activity and materially adverse action.[22]  Because the County does

not challenge the other elements, the court will not address them.  First, the County

argues that Schuette did not engage in protected activity because he did not file an

EEOC charge until February 14, 2018—after any alleged retaliation.  (ECF No. 35,

PageID.722, 730).  Second, the County argues that the sole retaliatory act that the

County took—the filing of the police complaint for extortion—cannot be the basis

for a retaliation claim as a materially adverse action because the County has a

constitutional right to file a complaint.  (*Id.* at PageID.736, ECF No. 45,

PageID.1271).  Nevertheless, the court finds that Schuette has demonstrated

genuine disputes as to both challenged prongs.

As a preliminary matter—although the argument's objective is relatively

unclear—the County claims that Schuette lacks standing to bring his retaliation

claims based on discrimination suffered by other protected groups.  In its brief for

---

[22] In its reply, the County also argued that *Younger* abstention applies here "because investigation by the Michigan State Police has not ended" regarding the police report filed. (ECF No. 45, PageID.1271).  Without ruling on the merits of that argument, the court find that it is forfeited because it was raised for the first time in reply.  *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("[W]e have found issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses.").  Furthermore, the County has failed to sufficiently articulate its argument by not addressing the three criteria for *Younger* abstention to apply:  (1) "state proceedings are currently pending"; (2) "the proceedings involve an important state interest"; (3) "the state proceedings will provide the federal plaintiff with an adequate opportunity to raise his constitutional claims."  *Doe v. Univ. of Ky.*, 860 F.3d 365, 369 (6th Cir. 2017).  The courts typically find such skeletal arguments forfeited. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

summary judgment, as to Schuette's allegations of discrimination against other protected groups, the County argued that "Plaintiff has no standing to claim damages or seek equitable relief on behalf of any such third persons."  (ECF No. 35, PageID.696, 713).  In the section of its reply addressing retaliation, the County addresses Rand's alleged discriminatory comments about women and, again, notes that "Plaintiff has no standing to complain of mistreatment of others."  (ECF No. 45, PageID.1270).  To the extent that the County is suggesting that Schuette may not bring his retaliation claims based on Rand's discrimination towards other protected groups, the argument is unavailing.  Plaintiffs may bring retaliation claims for opposition to the discrimination of others—even if not a member of the discriminated group.  *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 452 (2008) (holding that "an individual (black or white) who suffers retaliation because he has tried to help a different individual, suffering direct racial discrimination, secure his § 1981 rights" may can bring a claim under § 1981); *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1068 (6th Cir. 2015) (holding that a male plaintiff engaged in protected activity when he verbally told a supervisor to stop subjecting female employees to sexual harassment).

a.  Protected Activity

As to the protected-activity prong, "there are two types of protected activity: participation in a proceeding with the Equal Employment Opportunity Commission

("EEOC") and opposition to an apparent Title VII violation." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012). Title VII and the ELCRA prohibit an employer from retaliating against an employee who has opposed an "unlawful employment practice," 42 U.S.C. § 2000e-3(a), and "violation of [the ELCRA]," Mich. Comp. Laws § 37.2701. Section 1981 has also been interpreted to prohibit employer retaliation based on opposition to discriminatory conduct. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008).

While not framed as "opposition" to unlawful practices, Schuette essentially alleges that he engaged in opposition activity because he reported to Martonchik and Overton that Rand used racially discriminatory language, discriminates female deputy applicants, and regularly harasses officers because of their weight. The County argues that Schuette did not engage in protected activity because he did not file a charge of discrimination with the EEOC until February 14, 2018 and did not file a complaint with the EEOC until April 2018; all of the County's alleged wrongdoing took place before those filings. The County also notes that Schuette never participated in a hearing or proceeding. However, unlike like the participation clause, "[t]he opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). Thus, while the County is correct

that under the participation clause, Schuette would have to show retaliation for his participation in some formal EEOC proceedings, here, the court finds that Schuette has stated a claim under the opposition clause.  Schuette's report of Rand's alleged discriminatory behavior to Martonchik and Overton, respectively the County's Human Resource Director and Administrator, is considered opposition activity under the discrimination statutes.  *See Wasek*, 682 F.3d at 469 ("[C]omplaining about allegedly unlawful conduct to company management is classic opposition activity."); *Trujillo v. Henniges Auto. Sealing Sys. North Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012) ("We have repeatedly held that complaints to human resources personnel regarding potential violations of Title VII constitute protected activity for purposes of establishing a prima facie case of retaliation.").

### b.  Materially Adverse Action

"Plaintiff's burden of establishing a materially adverse employment action is 'less onerous in the retaliation context than in the anti-discrimination context.'" *Laster*, 746 F.3d at 731 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595–96 (6th Cir. 2014)).  "Unlike a Title VII discrimination claim, 'the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace.'" *Id.* (quoting *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006)).  Instead, "a plaintiff must show that a reasonable employee would have found the

challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Burlington N.*, 548 U.S. at 68). The court looks at the context of the action: "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (quoting *Burlington N.*, 548 U.S. at 69). For example, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

The County argues that the filing of a complaint for extortion with the police cannot be a materially adverse action because the County Administrator had a constitutional right to file such a complaint. Schuette responds that the adverse actions are "the refusal to conduct an investigation that could and would have justified removal of Rand, filing of false extortion charges and refusal to include the polygraph results in Plaintiff's personnel file." (ECF No. 41, PageID.1068). According to Schuette, these actions would dissuade a reasonable person from

opposing discrimination "because it ensured he would not be able to return to County employment and held him up to scorn in some quarters for being an extortionist." (*Id.* at PageID.1069).

As to the filing of a complaint with the police, the court finds that there is a genuine dispute as to whether that filing constitutes a materially adverse action. As Schuette notes, courts have found that filing of false criminal charges may constitute a materially adverse action. *See, e.g.*, *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996) (holding "the filing of charges against a former employee may constitute adverse action" because "criminal prosecution will . . . have an obvious impact" on individual's present or future employment prospects); *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 606 (7th Cir. 1999) (finding that the filing by an employer of "a false report to the police [that the plaintiff] was armed and laying in wait outside the [employer's] plant" "only moments after [the plaintiff] informed his supervisors that he had filed a charge of discrimination" was a retaliatory action). Here, Schuette insists he told Overton and Martonchik that he "deserved" to be placed "on paid leave pending an investigation [of Rand]" and that they "completely fabricate[d] the story about an enhanced pension and three more years and if not I'm releasing the tapes." (ECF No. 33-2, PageID.391). If Schuette's version of events about fabricated facts is ultimately accepted by the jury, then the County's actions could be deemed materially adverse. As a result,

viewing the facts in the lights most favorable to Schuette, he has created a genuine dispute as to whether the police complaint was an adverse action for purpose of retaliation.

The County argues, however, that it has a constitutional right to file a complaint and, therefore, it cannot be the basis for an adverse action.  But the cases cited by this court show that under certain circumstances filing a police complaint can be an adverse action.  The question of the constitutionality of the County's conduct is bound up in the resolution of the competing stories in any event.  The County cites two cases that the court finds inapt.  The first, *Motes v. United States*, states that an individual has a right and privilege under the Constitution "to aid in the execution of the laws of his country by giving information to the proper authorities of violations of those laws."  178 U.S. 458, 462–63 (1900).  But in that case, the Court merely held that that Congress has the power to criminalize "a conspiracy to injure, oppress, threaten, or intimidate a citizen" in the exercise of such a right.  *Id.* at 463.  The second, *Hall v. Pizza Hut of Am, Inc.*, reiterates the same constitutional right as in *Motes*.  396 N.W.2d 809, 812 (Mich. Ct. App. 1986).  Noting that constitutional right, the court rejected a false arrest claim against a Pizza Hut employee based on the good-faith information the employee provided to the police.  *Id.* at 811–12.  Neither case addresses whether a police report—here, allegedly a false one—can be the basis for retaliation.  As a result,

the court finds that Schuette has created a genuine dispute as to whether the County's police report was a materially adverse action.

But as to the County's refusal to conduct an investigation, the court finds that it was not a materially adverse action. Based on the record, it appears the county did not conduct a formal investigation of Rand. (*See* ECF No. 33-4, PageID.505; ECF No. 33-10, PageID.537–38). And as Schuette notes, a failure to investigate can be a materially adverse action if the failure "was both indifferent and unreasonable." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 349 (6th Cir. 2008). The court, however, must look to the entire context surrounding the failure to investigate. Here, the County attempted to remove Rand: it asked him to resign, rescinded his benefits, and petitioned the Governor to remove him. In other words, the County went beyond an investigation and presumably believed Schuette's accusations and took actions to remove Rand as Sheriff. In light of these circumstances, a reasonable person would not be dissuaded from opposing discrimination.

And as to the failure to include Schuette's polygraph test in his personnel file, the court also finds that it was also not a materially adverse action. First, Schuette has not directed the court to any case holding that the failure to include a polygraph test or any similar test constitutes a materially adverse action in the circumstances here. Furthermore, it is unclear to the court how this failure would

59

dissuade a reasonable person from opposing discrimination in light of the actions the County took in its attempt to remove Rand, as discussed. Second, Schuette admitted that he did not know whether the polygraph test was included in his file or not (ECF No.41-8, PageID.1167); instead, he merely speculates that it was not.

Therefore, although the court finds that the failure to investigate and to include Schuette's polygraph test are not materially adverse actions, the court also finds that Schuette has created a genuine dispute as to whether he suffered a materially adverse action based on the County's filing of a complaint with the police. And because there is a genuine dispute as to whether Schuette engaged in protected activity and suffered a materially adverse action, the only grounds on which the county bases its challenge, the County's Motion for Summary Judgment as to Counts I, II, and IV is **DENIED**.

## IV. MOTION IN LIMINE

On October 18, 2019, Schuette also filed a Motion in Limine (ECF No. 48) seeking to exclude deposition testimony regarding various statements he made and conduct he engaged in. According to Schuette, the statements and conduct are irrelevant under Federal Rule of Evidence 401 and more prejudicial than probative under Rule 403. Both Rand (ECF No. 49) and the County (ECF No. 52) filed responses. Schuette replied to both. (ECF Nos. 51, 53).

Under Rule 401, the standard for relevance is "extremely liberal." *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009).  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Under Rule 403, a court may exclude relevant evidence only if "its probative value is substantially outweighed by a danger of . . . unfair prejudice."  "The test is strongly weighted toward admission." *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018).  Here, comments Schuette made regarding disabled individuals, as discussed earlier, are highly relevant to whether his work environment was subjectively hostile.  As a result, the probative value of those comments is not substantially outweighed by the danger of unfair prejudice.  But to the extent the County wishes to introduce Schuette's testimony that he exposed himself while drinking at a golf course with Rand off-duty or an alleged incident where Schuette flashed his penis to a supervisor—an action which he denies—the court finds such evidence irrelevant to the ADA claim and at best of remote and indirect relevance to the Title VII retaliation claim and thus unfairly prejudicial.  As a result, the court **GRANTS IN PART AND DENIES IN PART** Schuette's Motion in Limine.

## V.    CONCLUSION

The court **GRANTS** Rand's Motion to Dismiss and Alternatively for Summary Judgment (ECF No. 33).  The court **GRANTS IN PART AND DENIES IN PART** the County's Motion for Summary Judgment (ECF No. 35). Accordingly, Count III is **DISMISSED WITH PREJUDICE**.  Count I, II, IV, and V as alleged against the County are retained.  The court also **GRANTS IN PART AND DENIES IN PART** Schuette's Motion in Limine.

    **IT IS SO ORDERED.**

Date: December 23, 2020        <u>s/Stephanie Dawkins Davis</u>
                                   Stephanie Dawkins Davis
                                   United States District Judge